**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**PURVIS INDUSTRIES, LLC, d/b/a
IMSCO,**

    Plaintiff,

**v.**               **No. 18-cv-00585 RB-LF**

**SPOKANE INDUSTRIES, INC.,**

    Defendant.

## MEMORANDUM OPINION AND ORDER

This motion for leave to file an amended complaint implicates multiple areas of New Mexico law—from distinguishing between implied contractual provisions and legal duties to identifying the elements of three distinct business torts. The underlying dispute, however, is far less complicated. Plaintiff IMSCO purchased industrial equipment manufactured by Defendant Spokane, then resold the equipment to its customers. IMSCO alleges that this relationship constituted a decades-long, unintegrated contract that Spokane breached by abruptly terminating the parties' business relationship without notice. Spokane subsequently sent its new, "exclusive distributor" an email suggesting that it would prepare and send a list of IMSCO's customers and sales information. IMSCO now seeks to amend its pleading to add three tort claims based on the alleged sharing of that customer information. Spokane argues the proposed new claims are futile. The Court finds that all but one of IMSCO's proposed amendments should be allowed at this stage, and will **grant in part** IMSCO's motion for leave to file an amended complaint (Doc. 35).

## I.  Background

In February 2018, Purvis Industries, LP, d/b/a IMSCO[1] filed suit in state court alleging that Spokane Industries, Inc. (Spokane) improperly terminated a contract under which Spokane, an

---

[1] Purvis Industries, LLC, d/b/a IMSCO (IMSCO), substituted as Plaintiff on June 21, 2018. (*See* Doc. 1 at 2.)

industrial manufacturer, had been selling mining and other industrial equipment to IMSCO at wholesale prices for nearly 30 years. (*See* Doc. 1-2 at 1, 3–4.) IMSCO alleges that "[i]n January 2017, without any notice, Spokane abruptly terminated IMSCO in favor of an IMSCO competitor, Power Equipment, who would serve as Spokane's exclusive distributer in New Mexico." (*Id.* at 1.) Further, according to IMSCO, Spokane offered Power Equipment "significantly better pricing" that "drastically devalue[ed IMSCO's] current Spokane inventory" and refused to accept a return or buyback of the inventory following the termination. (*Id.* at 1–2.) Upon learning of the basis for diversity jurisdiction in June 2018, Spokane timely removed the action. (*See* Doc. 1 at 2.) Jurisdiction arises under 28 U.S.C. § 1332. (*See id.*)

IMSCO's original complaint includes three counts.[2] (*See* Doc. 1-2.) Count I: Breach of Contract and Implied Covenant of Good Faith and Fair Dealing, alleges that Spokane breached the contract by terminating it without "reasonable notification[,]" as required by the New Mexico Uniform Commercial Code. (*Id.* at 7–8.) Count I also alleges that Spokane acted in bad faith in selling IMSCO goods valued at more than $6,000 just weeks before the termination, when it had "knowledge of its plans to terminate IMSCO and switch to a new, exclusive distributor who would receive significantly better pricing." (*Id.* at 9.) Count II: Violation of the New Mexico Unfair Practices Act (UPA), alleges that the actions described above qualify as "unconscionable trade practices" in violation of the UPA. (*Id.* at 10–11.) Count III: Rescission, seeks the rescission of "any and all sales made as a result of Spokane's misrepresentation by omission" in concealing its plans to terminate the contract in order to sell IMSCO products that became "practically unsaleable" after the termination. (*Id.* at 11–12.)

---

[2] Spokane has moved to dismiss each of IMSCO's original claims in separate motions (*see* Docs. 30; 46), which the Court will take up in a separate opinion.

On December 5, 2018, IMSCO filed its *Expedited* Motion for Leave to File Amended Complaint and to Amend Scheduling Order. (Doc. 35.) In response to the portion of the motion seeking an expedited ruling on amending the scheduling order, United States Magistrate Judge Laura Fashing "vacate[d] the scheduling order deadlines that ha[d] not yet passed, including the deadlines for expert disclosures and the termination date for discovery[,]" so that the portion of the motion seeking leave to file an amended complaint would be briefed on a regular schedule.[3] (Doc. 37.) IMSCO seeks to file an amended complaint adding three new claims for relief in addition to the three counts described above. (*See* Doc. 35 at 2.)

IMSCO's proposed new claims all rest upon the discovery of a single email (the "customer list email"), which Spokane first produced on September 28, 2018. (*Id.* at 5.) The customer list email "is a forward of a termination e-mail sent to The Western Group, another former New Mexico dealer of Spokane products." (*Id.*) In the body of the message, "a Spokane employee[] informs the three recipients: 'Here is the e-mail I just sent to IMSCO and Western Group. We are still working on the customer list to send to you with Co Names, part numbers and prices.'" (*See id.*) IMSCO's proposed amended complaint includes three additional claims based on the email— Count IV: Tortious Interference with Prospective Contractual Relationships; Count V: Common Law Unfair Competition; and Count VI: Prima Facie Tort. (*See* Doc. 35-1 at 16–21.) IMSCO added these new counts "based on Spokane's transmission of IMSCO customer information to Power Equipment, as revealed in the Customer List E-mail[,]" and also "adds allegations concerning the Customer List E-mail to [its] existing claims for Violation of the New Mexico Unfair Practices Act (Count II) and Rescission (Count III)." (Doc. 35 at 7–8.)

---

[3] Judge Fashing will reset the scheduling deadlines following the entry of this Memorandum Opinion and Order. (*See* Doc. 37.)

Spokane opposes IMSCO's motion to amend on two general grounds. First, that the motion "is being advanced for the improper purpose of dramatically expanding the scope and cost of this litigation, without a factual predicate to warrant such an expansion." (Doc. 39 at 1.) Referring to the customer list email as "the sole factual kernel underpinning IMSCO's push to dramatically expand the case[,]" Spokane argues that seeking to amend the complaint based solely on that email, without any evidence that Spokane *actually* provided Power Equipment with a list of IMSCO's customers, is improper and demonstrates bad faith. (*Id.* at 1–3.) Second, Spokane alleges that each of the new causes of action in IMSCO's proposed amended complaint are futile because they are barred by various legal doctrines and otherwise fail to state a claim. (*See id.* at 2–3.)

## II.     IMSCO has demonstrated good cause for leave to amend.

Under Federal Rule of Civil Procedure 15(a)(2), a party seeking leave to amend its pleading outside the time allowed for amendments as a matter of course may do so "only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* Liberally allowing leave to amend ensures "the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir. 1982) (citation omitted). However, leave to amend may be properly denied for various reasons including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment . . . ." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Though Judge Fashing's December 2018 Order vacated all remaining scheduling order deadlines, Rule 16(b)(4) is also implicated in the Court's analysis of IMSCO's motion because the deadline set forth in the scheduling order for amending its pleadings has passed. (*See* Doc. 18 at

2.) "[A] scheduling order 'may be modified only for good cause and with the judge's consent.'" *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1240 (10th Cir. 2014) (citing Fed. R. Civ. P. 16(b)(4)). "In practice, this standard requires the movant to show the scheduling deadlines cannot be met despite [the movant's] diligent efforts." *Id.* (citation and quotation marks omitted). The good cause requirement "may be satisfied . . . if a plaintiff learns new information through discovery or if the underlying law has changed." *Id.* (citation omitted).

The scheduling order set September 27, 2018, as the deadline for IMSCO to amend its pleadings. (Doc. 18 at 2.) Spokane was required to produce documents in response to IMSCO's first set of requests by September 12, 2018. (Doc. 35 at 4.) Spokane's counsel were in the process of moving to a new law firm, so they requested and received from IMSCO's counsel two extensions of the production deadlines. (*Id.*) The resulting new deadline for the production of the first set of documents was September 28, 2018—one day past IMSCO's deadline to amend its pleadings. (*Id.* at 5.) On that date, Spokane produced the customer list email that underlies IMSCO's proposed new claims for relief. (*See id.*) This sequence of events makes clear that IMSCO could not have sought these specific amendments before the scheduling order deadline "despite [its] diligent efforts[,]" *see Gorsuch*, 771 F.3d at 1240, because "IMSCO did not obtain the e-mail giving rise to its new claims—or indeed, any Spokane document production—until September 28, the day after IMSCO's deadline to amend." (Doc. 35 at 8.)

Thus, the factors relating to good faith, timing, and diligence suggest that the Court should freely give leave to amend the complaint, and that there is good cause to amend the scheduling order to do so. *See id.*; *Foman*, 371 U.S. at 182; Fed. R. Civ. P. 15(a)(2). The Court need not belabor this point since Spokane does not dispute it. (*See* Doc. 39 at 1 ("Spokane does not challenge IMSCO's Motion to Amend on grounds of timeliness").) However, before determining

whether to grant IMSCO's motion, the Court must take up Spokane's various arguments that the proposed amendments are futile and should thus be denied.

## III. Futility Analysis

"Although [Rule] 15(a) provides that leave to amend shall be given freely, the district court may deny leave to amend where amendment would be futile. A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Bradley v. Val-Mejias*, 379 F.3d 892, 901 (10th Cir. 2004) (quoting *Jefferson Cty Sch. Dist. v. Moody's Inv'r's Servs.*, 175 F.3d 848, 859 (10th Cir. 1999)). Spokane argues that IMSCO's proposed new claims lack a solid enough factual predicate to survive a motion to dismiss, would be barred as a matter of law under various doctrines, and would otherwise fail Rule 12(b)(6) motions to dismiss for failing to state a claim. (*See* Doc. 39 at 6.)

### A. The customer list email provides a sufficient factual predicate for IMSCO's proposed new causes of action.

Spokane takes issue with the fact that IMSCO's proposed amendments are based solely on the customer list email, rather than evidence that it actually shared customer information with IMSCO's competitors. (*See id.* at 3–4.) According to Spokane, since IMSCO subpoenaed Power Equipment seeking such a list and made detailed discovery requests of Spokane for the same information, "the prudent course would have been to wait for Power Equipment's and Spokane's respective responses, determine whether there was indeed a factual predicate for amendment, and move to amend the complaint if and when IMSCO's suspicions could be confirmed." (*Id.* at 4.) Further, Spokane asserts that it has now "stat[ed] under oath and in no uncertain terms that Spokane never provided Power Equipment with a list of IMSCO customers" and Power Equipment likewise produced no such list, so continuing to seek to amend the complaint "will amount to bad faith, and will work an undue prejudice on Spokane." (*Id.* at 4–5.)

IMSCO counters that this is a factual dispute that is not properly addressed at the motion to amend stage. "There is no provision in the [Federal Rules of Civil Procedure] that allows a defendant to obtain dismissal of a lawsuit simply by representing that it did not do what the plaintiff alleges." (Doc. 41 at 3.) To the contrary, "a plaintiff is entitled to pursue discovery, including depositions, based on allegations made in good faith and with a factual predicate[.]" (*Id.*) IMSCO argues that the email from Spokane promising to send Power Equipment IMSCO's customer list is a sufficient factual predicate. (*See id.*) Further, IMSCO disagrees with Spokane's characterization of its discovery responses. (*See id.*) IMSCO argues that rather than "stating in no uncertain terms" that it never provided Power Equipment with a list of IMSCO's customers, Spokane actually stated only that "after a diligent search Spokane was not able to locate, and is not aware of having created or sent, any subsequent communications with Power Equipment related to [the referenced] customer lists." (*Id.* (internal quotation marks and citations omitted).)

The Court finds that the customer list email presents a sufficiently strong factual predicate to support IMSCO's proposed new claims at the pleading stage. Though Spokane's and Power Equipment's responses to discovery requests thus far appear not to have revealed additional evidence that Spokane shared IMSCO's customer information, discovery has not yet closed. Accordingly, the phrasing of the customer list email, including the clear statement "[w]e are still working on the customer list to send to you with Co Names, part numbers and prices," provides enough of a factual predicate for IMSCO to allege that Spokane subsequently shared its customer information. (*See* Doc. 35 at 5.) That Spokane has stated it "was not able to locate, and is not aware of having created or sent, any subsequent communications" may support a future motion for summary judgment or Spokane's argument at trial. (*See* Doc. 41 at 3.) However, this response alone does not convince the Court that there is absolutely no factual predicate upon which IMSCO

seeks to amend its complaint and conduct additional discovery. Similarly, Spokane has not elaborated on how the additional causes of action based on the customer list email "will work an undue prejudice on Spokane" other than having to defend the lawsuit. (*See* Doc. 39 at 5.) IMSCO is entitled to seek more information throughout the discovery period, including, as it argues, through depositions. (*See* Doc. 41 at 3.)

### B. The New Mexico Trade Secrets Act does not preempt the proposed new causes of action.

Spokane also argues that each of IMSCO's proposed new causes of action are preempted by the New Mexico Uniform Trade Secrets Act, N.M. Stat. Ann. §§ 57-3A-1 through 57-3A-7 (1978) (NMUTSA). (Doc. 39 at 6.) The NMUTSA defines misappropriation of a trade secret as the disclosure of "information, including a formula, pattern, compilation, program, device, method, technique or process," § 57-3A-2(D), "without express or implied consent by a person who . . . acquired [it] under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . ." § 57-3A-2(B)(2)(b)(2). (*See also* Doc. 39 at 7.) Spokane argues that the Act's definitions "evinc[e] the legislature's intent to provide the exclusive avenue for relief for conduct involving the misappropriation of confidential information by a competitor in the commercial setting." (*Id.*)

IMSCO, on the other hand, points to a recent case in which a court in this District rejected a similar argument that the NMUTSA preempts state common law claims. In *Array Technologies, Inc. v. Mitchell*, the defendant argued that tort claims based on misrepresentation of trade secrets were preempted by the NMUTSA because they were based on the same facts that formed the basis of the plaintiff's explicit claim for relief under the NMUTSA. 305 F. Supp. 3d 1256, 1275 (D.N.M. 2018). United States District Judge James O. Browning opined that, to the contrary, the defendant "correctly contends that New Mexico courts would not recognize preemption and would allow common law claims for conversion of trade secrets" because the New Mexico Legislature adopted

elements of the Uniform Trade Secrets Act to create the NMUTSA, but specifically did *not* include the uniform act's preemption clause. *See id.* ("New Mexico adopted the Uniform Trade Secrets Act . . . . The New Mexico legislature, however, did not adopt the preemption provision in the NMUTSA.") (citation omitted).

In determining whether a state statute provides exclusive remedies, courts must consider, among other things, "whether there is any indication in the [statute] that the legislature intended its remedies to be exclusive and thus preempt [any] common-law remedy." *Gutierrez v. Sundancer Indian Jewelry, Inc.*, 868 P.2d 1266, 1272 (N.M. Ct. App. 1993). The plain language of the NMUTSA does not include a preemption provision, and the Court agrees with Judge Browning's assessment in *Array Technologies* that the Legislature's decision to omit an explicit preemption provision from the NMUTSA evinces clear intent that the NMUTSA should *not* preempt tort claims based on similar facts. *See* 305 F. Supp. 3d at 1275. Further, IMSCO's non-tort claims sound in breach of contract, the New Mexico Unfair Practices Act, and rescission—not a specific claim under the NMUTSA, as was the case in *Array Technologies. See id.* That the Legislature would have intended the NMUTSA to preempt IMSCO's claims in tort is thus even less likely here, where IMSCO is not alleging a separate violation of the NMUTSA.

**C.  The economic loss rule does not bar the proposed new causes of action.**

Spokane next argues that IMSCO's proposed new causes of action sounding in tort are barred by the economic loss rule "[b]ecause IMSCO pleads the existence of a contract (and breach of that contract by Spokane) . . . ." (Doc. 39 at 7.)  According to Spokane, because "IMSCO alleges a decades-long contractual relationship between itself and Spokane[,] . . . IMSCO's alleged 'reasonable expectation' that its customer information would be kept confidential is simply one more legal obligation under the broad canopy of that relationship." (*Id.* at 8.) IMSCO counters that

"the economic loss rule does not apply where, as here, 'the tort arises from conduct that is alleged to go beyond the contractual duties of the parties.'" (Doc. 41 at 5 (quoting *Bull v. BGK Holdings, LLC*, 859 F. Supp. 2d 1238, 1243 (D.N.M. 2012)).) IMSCO argues that its tort claims are based on "disclosure of proprietary customer information in which IMSCO had a reasonable expectation of confidentiality," and that the complaint does not allege that the unintegrated contract with Spokane contained a confidentiality provision. (*See id.* at 5–6.)

The economic loss rule "precludes recovery in tort for purely economic losses where the claims alleged are based on breach of an express or implied contractual duty." *See Bull*, 859 F. Supp. 2d at 1243 (citation omitted). The rule was first adopted in New Mexico in *Utah International, Inc. v. Caterpillar Tractor Co.*, 775 P.2d 741, 744 (N.M. Ct. App. 1989), and was affirmed by the New Mexico Supreme Court in *In re Consolidated Vista Hills Retaining Wall Litigation*, 893 P.2d 438, 446 (N.M. 1995). Attempts to bar recovery under the economic loss rule "ha[ve] merit only if [the plaintiff] is seeking monetary damages for economic loss as a result of a breach of contract between the parties." *Bull*, 859 F. Supp. 2d at 1243. "[T]he rule does not bar tort claims arising from an independent duty of care." *Farmers All. Mut. Ins. Co. v. Naylor*, 452 F. Supp. 2d 1167, 1174 (D.N.M. 2006). "Under New Mexico law, the 'difference between a tort and contract action is that a breach of contract is a failure of performance of a duty arising or imposed by agreement; whereas, a tort is a violation of a duty imposed by law.'" *Bull*, 859 F. Supp. 2d at 1243 (quoting *Kreischer v. Armijo*, 884 P.2d 827, 829 (N.M. Ct. App. 1994)).

IMSCO's assertion that it had a "reasonable expectation" that its customer information would be kept confidential and used by Spokane only in the context of their business relationship is referenced frequently throughout the proposed amended complaint. Such language appears in the complaint's list of factual allegations (Doc. 35-1 ¶ 47 ("IMSCO had the reasonable expectation

that any customer contact information or purchasing history provided to Spokane or learned by Spokane through IMSCO would only be used by Spokane, if at all, in the context of the parties' business relationship" and that "Spokane would maintain any such information confidential as to third parties"), ¶ 50 (the customer list email referred to "information concerning IMSCO customers that Spokane collected and compiled, and was obligated to keep confidential").) Such language is incorporated by reference under each of the six specific causes of action and explicitly restated in each of the three new proposed tort claims. (*See id.* ¶¶ 93, 104, 116).

The fact that the proposed amended complaint makes frequent use of such relatively vague language alleging an expectation of confidentiality does leave room for Spokane's argument that IMSCO is framing this expectation as an implied provision of the alleged unintegrated contract. (*See* Doc. 39 at 8.) However, the Court declines to infer this intent from IMSCO's broad language at the pleadings stage in order to deny IMSCO's proposed amendments. Instead, the Court will compare the portion of the amended complaint where IMSCO actually makes a claim for relief that sounds in contract—Count I—to the proposed claims sounding in tort—Counts IV through VI—to determine whether the tort claims allege economic loss stemming only from breach of contract. In Count I, IMSCO alleges that Spokane breached its contract and duty of good faith and fair dealing by terminating IMSCO without notice and selling thousands of dollars' worth of goods to IMSCO when it knew the termination was imminent. (*See* Doc. 35-1 at 10–12.) Count I conspicuously does *not* contain any allegations that suggest Spokane breached the contract or its duty of good faith and fair dealing by sharing the customer lists. (*See id.*)

The three claims sounding it tort, on the other hand, focus on Spokane's conduct *after* it allegedly terminated the contract. Count IV alleges that Spokane interfered with IMSCO's prospective contractual relationships by sharing its customer information with Power Equipment.

(Doc. 35-1 at 17 ("*after it terminated IMSCO as a dealer*, Spokane improperly provided a list of IMSCO customers and/or information about IMSCO customers . . . so that Power Equipment would use the list/information to target IMSCO customers and continue to sell Spokane products to them") (emphasis added).) In Count V, IMSCO alleges that Spokane committed the tort of common law unfair competition by sharing the customer lists after terminating IMSCO as a dealer. (*See id.* at 18–19.) And in Count VI, IMSCO alleges that Spokane committed, in the alternative, a prima facie tort by the same conduct—providing Power Equipment with IMSCO's customer lists *after terminating IMSCO's contract*. (*See id.* at 19–21.)

Thus, despite IMSCO's general assertion that it reasonably expected Spokane would keep confidential any IMSCO customer information it collected or obtained, IMSCO's allegations sounding in contract do not overlap with those sounding in tort. Its tort claims do not allege that sharing the customer lists violated a term of the parties' alleged unintegrated contract, but rather that sharing the customer list was "a violation of . . . dut[ies] imposed by law'" prohibiting tortious interference with prospective contracts, unfair competition, and intentional infliction of harm. *See Bull*, 859 F. Supp. 2d at 1243. Further, the alleged actions giving rise to the tort claims clearly post-date the alleged breach of contract through termination. The Court thus finds that IMSCO is not merely asserting tort claims to "seek[] monetary damages for economic loss as a result of a breach of contract between the parties." *See id.* Since this is the only conduct prohibited by the economic loss rule, IMSCO's claims are not barred by this doctrine.

### D. Proposed Counts IV and VI state a claim pursuant to Rule 12(b)(6), while Count V does not.

Spokane next argues that each of IMSCO's new causes of action in the proposed amended complaint fail to state a claim under Federal Rule of Civil Procedure 12(b)(6), and are thus futile. (*See* Doc. 39 at 9–17.) In reviewing a pleading under the Rule 12(b)(6) standard, the Court "must

accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015) (citation omitted). To survive a motion to dismiss, the complaint need not contain "detailed factual allegations," but it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausibility does not equate to probability, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

### i. IMSCO states a claim for Tortious Interference with Prospective Contractual Relations (Count IV).

According to Spokane, IMSCO's claim for tortious interference with prospective contractual relations is futile under a Rule(12)(b)(6) standard because it does not sufficiently allege facts showing Spokane used "improper means" to interfere with IMSCO's prospective client relationships. (Doc. 39 at 9.) IMSCO argues that its allegations "readily satisfy the improper means element[,]" as the allegations go beyond mere "competition" to allege "an effort to steal IMSCO customers through misuse of IMSCO information gained through the parties' abruptly terminated long-term business relationship." (Doc. 41 at 8.) Further, IMSCO argues, whether actions constitute "improper means" under New Mexico law is "a highly factual question that is not properly considered at the motion to amend stage." (*Id.*)

In New Mexico, the tort of intentional interference with prospective contractual relations is based on the definition set out in the Restatement (Second) of Torts § 766B (Am. Law Inst.

1979). *See M & M Rental Tools, Inc. v. Milchem, Inc.*, 612 P.2d 241, 245 (N.M. Ct. App. 1980).

The Restatement's definition provides that:

> One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B. Liability for this tort requires "either an improper motive (solely to harm plaintiff), or an improper means . . . ." *Anderson v. Dairyland Ins. Co.*, 637 P.2d 837, 84 (N.M. 1981) (citing *M & M*, 612 P.2d at 246). "Although tortious behavior and behavior that violates other statutes will amount to improper conduct, the conduct required by this tort need not be tortious in itself." *Diversey Corp. v. Chem-Source Corp.*, 965 P.2d 332, 339 (N.M. Ct. App. 1998). However, in the absence of improper means or motive, "[i]t is no tort to beat a business rival to prospective customers." *M & M*, 612 P.2d at 245 (citation omitted).

IMSCO does not claim that Spokane misused its customer information with an improper motive, so the Court's analysis of Count IV is limited to IMSCO's claim for intentional interference with prospective contractual relations by improper means. (*See* Doc. 35-1 at 17.) What constitutes improper means is a "nebulous concept" that is not clearly defined under New Mexico law. *Mountain Highlands, LLC v. Hendricks*, No. IV 08-0239 JB/ACT, 2009 WL 2426197, at *12 (D.N.M. July 14, 2009); *see also Whiting v. DISA Glob. Sols.*, No. CV 15-099 JCH/GBW, 2015 WL 13651174, at *3 (D.N.M. Sept. 30, 2015) ("[w]hat may qualify as 'improper means' depends to some degree on context and can include, but is not limited to predatory behavior, violence, threats or intimidation, deceit or misrepresentation, bribery, economic pressure, unfounded litigation, defamation, unlawful conduct, and perhaps violation of business ethics and customs") (citing *M & M*, 612 P.2d at 246; Restatement (Second) of Torts § 766B cmt. c). "Predatory

behavior is defined as behavior that is 'wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession.'" *Todd v. RWI Acquisition LLC*, No. 212CV00114MCAGBW, 2012 WL 12882371, at \*9 (D.N.M. June 1, 2012) (quoting *Diversey*, 965 P.2d at 339 (quoting *M & M*, 612 P.2d at 246)).

To apply these existing definitions of "improper means" and "predatory behavior," courts look to examples of what actions have been found to constitute "improper means" supporting a claim of tortious interference with prospective contractual relations and what actions do not rise to that level. In *M & M*, the court found no "improper means" when one of the defendant company's employees convinced a customer to rent pump equipment from the defendant rather than the plaintiff company. *M & M*, 612 P.2d at 246. In that case, the plaintiff company received a call from a customer looking for a certain type of pump. *Id.* at 243. An employee from the defendant company happened to be visiting the plaintiff company, asked to speak with the caller, offered to sell the customer the pump, and later concluded the transaction. *Id.* The plaintiff argued that by asking to speak to the customer and securing the transaction initially meant for the plaintiff, the defendant company had interfered with prospective business relations. *Id.* at 243–44. The court, however, found that the conduct did not amount to "improper means." *See id.* at 246 ("inasmuch as the parties were competitors, [defendant] did not employ wrongful means").

In *Brule v. Blue Cross and Blue Shield of New Mexico*, cited by both IMSCO and Spokane, a federal district court applying New Mexico law held that a Blue Cross employee did not use "improper means" leading to tortious interference with potential contractual relations when he included information about an independent insurance broker's commission rate on informational material that he and the broker jointly provided to potential customers. *See* No. 10-CV-835 JP/WDS, 2011 WL 13190108, at \*5 (D.N.M. Jan. 5, 2011), *aff'd*, 455 F. App'x 836 (10th Cir.

2011). The insurance broker sued, claiming that by including his specific commission rate on the flyer, Blue Cross had revealed information that made potential clients less likely to use the broker's services. *See id.* The court contrasted the facts in *Brule* with those in a case where the New Mexico Court of Appeals *did* find improper means—*Diversey Corp. v. Chem-Source Corp.*, 965 P.2d at 336. In that case, the Court of Appeals held that "the claimant, Chem-Source, showed that the representatives of Diversey Corp. executed 'an organized and concerted campaign . . . to spread misleading information about Chem-Source . . . to its customers' to convince them to switch from Chem-Source to Diversey as their supplier." *Brule*, 2011 WL 13190108, at *5 (citing *Diversey*, 965 P.2d at 336). The *Brule* court explained that the defendants' actions in *Diversey*, including making false representations that Chem-Source was going out of business and going bankrupt, were more clearly "improper means" than the disclosure of the broker's "truthful but embarrassing" commission rate to potential customers. *Id.*

Another court found that allegations a defendant company had engaged in an aggressive marketing campaign targeted at plaintiff company's customers, which included making false and misleading statements about plaintiff, sufficiently stated a claim for interference with prospective contracts by improper means. *See Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, No. CV 08-1101 JB/RLP, 2009 WL 10699130, at *12 (D.N.M. Sept. 11, 2009) ("[d]efendants' alleged breach [of various contractual provisions], combined with other facts and circumstantial evidence" of the misleading marketing campaign, convinced the court "that a reasonable fact-finder could conclude that the Defendants were engaged in 'predatory' conduct"); *see also Whiting*, 2015 WL 13651174, at *3 (allegations that a drug testing company refused to remove a false positive test from plaintiff's records was sufficiently pleaded to state a claim of improper conduct leading to tortious interference because plaintiff alleged "that [defendant's] misrepresentation [that he tested positive

for cocaine use] has discouraged prospective employers in the oil and gas industry from hiring him"); *Harvey E. Yates Co. v. Cimarex Energy Co.*, No. 12-857 JH/SMV, 2014 WL 11512599, at *3, 15 (D.N.M. Mar. 5, 2014) (allegations that defendant "developed a plan to utilize the [state] regulatory process . . . to invade the higher oil and gas reserves" on plaintiff's property could sustain a claim for tortious interference with prospective contracts).

The Court finds that Count IV of IMSCO's proposed amended complaint sufficiently alleges "more than a sheer possibility" that Spokane used "improper means" to target IMSCO's potential customers by exploiting IMSCO's confidential customer information and sharing it with IMSCO's competitors. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Clearly, cases in which courts have found "improper means" under New Mexico law have often involved defendants accused of lying to and misleading potential customers, which IMSCO has not alleged here. *See, e.g.*, *Guidance Endodontics, LLC*, 2009 WL 10699130, at *12; *Diversey*, 965 P.2d at 336. However, courts have also found that a reasonable factfinder could consider refusing to remove a false positive drug test from plaintiff's file or manipulating oil and gas regulations to increase profits at a competitor's expense to be improper means. *See Whiting*, 2015 WL 13651174, at *3; *Harvey E. Yates Co.*, 2014 WL 11512599, at *15. Indeed, the caselaw described above demonstrates that whether a defendant's actions amount to "improper means" is a highly fact-specific inquiry that could include the "violation of business ethics and customs." *See Whiting*, 2015 WL 13651174; *Zarr v. Washington Tru Sols., LLC*, 208 P.3d 919, 922 (N.M. Ct. App. 2009). Thus, "accept[ing] all the well-pleaded allegations of the complaint as true" and construing them in the light most favorable to IMSCO, the Court cannot say that IMSCO has failed to state a claim that Spokane used improper means to interfere with its prospective contractual relations. *See In re Gold Res. Corp. Sec. Litig.*, 776 F.3d at 1108.

### ii. IMSCO fails to state a claim for Common Law Unfair Competition (Count V).

Spokane next argues that "the alleged act of sharing a list of potential customers, without more, is not sufficient to state a claim for Common Law Unfair Competition . . . ." (Doc. 39 at 11.) Spokane's argument here focuses primarily on the concept of free market competition—asserting in broad terms that the common law tort creating potential liability for unfair competition does not prevent Spokane from contacting or selling to customers who had previously purchased Spokane products through IMSCO. (*See id.* at 11–12.) Spokane frames the alleged sharing of IMSCO's customer lists as merely passing along information about customers who had purchased Spokane products in the past to its new exclusive dealer, Power Equipment. (*See id.* at 14.) According to Spokane, prohibiting such sharing would unfairly allow IMSCO to lock in customers based on past sales, which is "anathema to the objectives of free competition . . . ." (*Id.*) IMSCO avers that "[a]lthough these customers purchased Spokane equipment from IMSCO, they were IMSCO customers, not Spokane customers. That is, the commercial relationship was only between IMSCO and the customers." (Doc. 35-1 ¶ 48.)

New Mexico courts generally rely on the definition set forth in the Restatement (Third) of Unfair Competition § 1 (Am. Law Inst. 1995) to define the elements of a common law unfair competition claim. *See N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 54 F. Supp. 3d 1189, 1235–36 (D.N.M. 2014). The Restatement provides that "[o]ne who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless" the harm results from one of several enumerated sources, including deceptive marketing, trademark infringement, and misappropriation of trade values including trade secrets. *See* Restatement (Third) of Unfair Competition § 1(a)(1)–(3). In addition to these enumerated unfair practices, the Restatement also

allows recovery under a "residual category encompassing other business practices determined to be unfair." Restatement (Third) of Unfair Competition § 1 cmt. g. A claim under this residual provision is tied to harm resulting from "other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public . . . ." Restatement (Third) of Unfair Competition § 1(a).

IMSCO argues that Spokane's disclosure of its customer lists to IMSCO competitors constitutes unfair competition either under the enumerated category for the "appropriation of intangible trade values including trade secrets," or the residual category including other acts and practices "determined to be actionable as an unfair method of competition . . . ." (*See* Doc. 41 at 10 (quoting Restatement (Third) of Unfair Competition § 1).) Beyond this statement, however, IMSCO provides no substantive argument as to why this is so. To the contrary, IMSCO explicitly states that it "does not assert a trade secrets claim and thus is not required to plead the existence of a trade secret" (*id.* at 10 n.2), but does not explain how its customer information might constitute some other form of "intangible trade value[]" falling under § 1(a)(3) if it is not a trade secret. IMSCO cites no caselaw to support the proposition that the customer lists are "intangible trade values," and commentary in the Restatement discussing the scope of protection for such trade values states that "[t]he primary sources of protection for intangible trade values are the federal patent and copyright laws." Restatement (Third) of Unfair Competition § 38 cmt. a. As a list of customer information is presumably not the type of information that IMSCO could copyright or patent, the concept of intangible trade values appears not to apply to these allegations, and IMSCO has presented no argument to convince the Court otherwise.

Thus, IMSCO's claim of common law unfair competition hangs on the residual category of unfair practices, but here too IMSCO has failed to show how the alleged sharing of customer information falls, even arguably, under this category. The Restatement commentary discussing this category of unfair practices explains that "a primary consideration is the social utility of the conduct as a means of competition. If the conduct is likely to interfere in a substantial manner with the ability of prospective purchasers to choose on the merits of the competing products, it will ordinarily be considered unfair." *Id.* § 1 cmt. g. Even if Spokane provided Power Equipment with a list of IMSCO's former customers and what types of Spokane products they purchased in the past, it is not at all clear to the Court that being contacted by Power Equipment with a competing offer to sell Spokane products would "interfere in a substantial manner with the ability of [those prior IMSCO customers] to choose on the merits of the competing products," or in this case, competing distributors. *See id.*

IMSCO argues that interpreting the Restatement in this manner would "permit[] virtually any type of for-profit enterprise," but this is not so. (*See* Doc. 41 at 10.) The Restatement lays out several examples of when the residual category might cover conduct amounting to unfair business practices—and each example involves striking dishonesty and manipulation. *See* Restatement (Third) of Unfair Competition § 1 cmt. g, illus. 5–7 (examples of unfair competition in this category include: sending letters to a competitor's customers falsely stating that the competitor infringes on its patent and threating legal action against the customers for continued use of that product; altering bidding figures to secure a contract; and filing a change of address on behalf of a competitor to prevent it from receiving important business offers.) Though the illustrations in the Restatement by no means fully define the scope of what conduct may fall under the residual category, they serve as a useful example of what types of unenumerated actions might constitute

unfair competition. Providing a customer list to a former distributor's competitor does not seem to rise to the same level of dishonesty, unfairness, and manipulation envisioned in the Restatement.

Further, IMSCO has presented no persuasive case law or other legal arguments that Spokane's alleged conduct could constitute unfair business practices in this case, beyond quoting the Restatement for the proposition that "[a] competitor who diverts business from another . . . through the wrongful use of confidential information . . . may in some circumstances be subject to liability for unfair competition even if the conduct is not specifically actionable under the rules relating to deceptive marketing or the appropriation of trade secrets." (Doc. 41 at 10–11 (quoting Restatement (Third) of Unfair Competition § 1 cmt. g).)

The nonbinding cases that IMSCO does cite are inapposite, because the sensitive information that was shared as the basis of the unfair competition claims in those cases was either explicitly made confidential by contract, or was much more specific and proprietary than the customer information allegedly shared by Spokane. *See DePuy Synthes Sales, Inc. v. Globus Med., Inc.*, 259 F. Supp. 3d 225, 230–31, 247 (E.D. Pa. 2017) (claim for unfair competition sufficiently stated when the plaintiff alleged that the defendant exploited, in violation of employee contracts, confidential business information "including periodic and year-end sales data, performance rankings . . . as well as information related to [plaintiff's] research and development plans and strategy and sensitive discussions between [plaintiff] and its customers related to the development and rollout of new products and the refinement of existing products"); *Larry Pitt & Assocs. v. Lundy Law, LLP*, 57 F. Supp. 3d 445, 456 (E.D. Pa. 2014) ("The Court will allow [plaintiff] to pursue its claim that [defendant] . . . provided Lundy Law with competitively sensitive information regarding competitors' advertising budgets and practices, as [plaintiff] may be able to establish that this constituted an appropriation of [plaintiff's] intangible trade values").

Here, contacting former IMSCO customers with competitive offers, or even providing a list of those customers to Power Equipment to do the same, does not amount to common law unfair competition "taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public." *See* Restatement (Third) of Unfair Competition § 1(a). Accepting IMSCO's allegations as true, Spokane provided Power Equipment with a list of IMSCO's customers so that Power Equipment could reach out to sell them Spokane products at a lower price. (*See* Doc. 35-1 at 18–19.) As a result, former IMSCO customers would likely have to choose between buying Spokane products from IMSCO or Power Equipment, and receiving an offer to purchase the same products at a lower price would not appear to negatively affect those customers. The proposed amended complaint does not allege that Spokane misled or intimidated the customers or maligned IMSCO. Offering Power Equipment lower prices and sharing IMSCO's customer list immediately after the abrupt termination of their contract may indeed have caused IMSCO economic harm. However, IMSCO has not persuaded the Court that these allegations, accepted as true, could rise to the level of common law unfair competition as recognized under New Mexico law. IMSCO thus fails to state a claim for unfair competition in Count V.

### iii. IMSCO states a claim for Prima Facie Tort (Count VI).

Spokane argues that "under New Mexico law a party is barred from pleading prima facie tort in the alternative." (Doc. 39 at 16.) That assertion, however, is contradicted by the very cases Spokane cites to support it. *See Bogle v. Summit Inv. Co., LLC*, 107 P.3d 520, 529 (N.M. Ct. App. 2005) ("New Mexico courts have accepted the view that prima facie tort may be pleaded in the alternative."). Claims of prima facie tort "should be used to address wrongs that otherwise escaped categorization, but should not be used to evade stringent requirements of other established doctrines of law." *Fogelson v. Wallace*, 406 P.3d 1012, 1028 (N.M. Ct. App. 2017) (citing *Bogle*,

107 P.3d at 529). Thus, New Mexico law allows prima facie tort claims in the alternative at the pleading stage, but requires that "if at the close of the evidence, plaintiff's proof is susceptible to submission under one of the accepted categories of tort, the action should be submitted . . . on that cause and not under prima facie tort." *Bogle*, 107 P.3d at 529 (citations omitted). *See also Bull*, 859 F. Supp. 2d at 1248–49 (denying a motion to dismiss a prima facie tort claim at the pleading stage because "[p]rima facie tort may be pled in the alternative," and while the court was "inclined to agree with Defendants that [the prima facie tort] allegations do not fall outside of the classic intentional tort categories," it was "reluctant to dismiss [the prima facie tort claim] before the evidence ha[d] been developed in th[e] case") (citations omitted). At this stage, IMSCO is not barred from pleading prima facie tort in the alternative.

Spokane also fails to convince the Court that IMSCO has not sufficiently stated a claim for prima facie tort. In New Mexico, a successful claim for prima facie tort requires a plaintiff to show: "(1) an intentional and lawful act; (2) an intent to injure the plaintiff; (3) injury to the plaintiff as a result of the intentional act; (4) and the absence of sufficient justification for the injurious act." *Beaudry v. Farmers Ins. Exch.*, 412 P.3d 1100, 1104 (N.M. 2018) (quoting *Lexington Ins. Co. v. Rummel*, 945 P.2d 992 (N.M. 1997)). Spokane argues that IMSCO has failed to state a claim meeting these requirements because "in the same sentence that IMSCO alleges an intent to injure, it concedes an intent to increase sales through its exclusive dealer—that is, an intent to compete." (Doc. 39 at 17.) IMSCO, however, correctly points out that factor two, "intent to injure" can be satisfied *even if* the defendant has dual motives, one of which may be economic self-interest. *See, e.g.*, *Schmitz v. Smentowski*, 785 P.2d 726, 735 (N.M. 1990) ("to allow a defendant to escape liability solely because he can demonstrate some economic benefit to himself from the complained of act would defeat the policy behind our recognition of prima facie tort[,]" that a plaintiff may

"recover for intentionally committed acts that, although otherwise lawful, are committed with the intent to injure."). (*See also* Doc. 41 at 12.) While the alleged tortious act "must be committed with the intent to injure plaintiff, or, in other words, without justification . . . it need not be shown that the act was solely intended to injure plaintiff." *Schmitz*, 785 P.2d at 735.

While Spokane's argument as to the second factor thus clearly fails, Spokane's cursory argument regarding factor four, that by acknowledging economic gains as part of Spokane's intent IMSCO has "acknowledge[d that] Spokane's conduct was justified[,]" is similarly unavailing. (*See* Doc. 39 at 17.) If desire for economic benefit were enough to justify any act that was also carried out with intent to injure, then no situation in which a defendant had dual intent to harm and to make money could sustain a prima facie tort claim, and the New Mexico Supreme Court's holding in *Schmitz* would be rendered meaningless. *See* 785 P.2d at 735. The Court thus finds that IMSCO states a sufficient claim for prima facie tort in the alternative.

Finally, the Court notes that there is no need to certify any of the questions related to the futility of IMSCO's proposed amendments to the New Mexico Supreme Court at this stage in the litigation and will not entertain Spokane's arguments to that effect. (*See* Doc. 39 at 17–18.)

**THEREFORE**,

**IT IS ORDERED** that Plaintiff's Motion for Leave to File Amended Complaint (Doc. 35) is **DENIED in part** as to Count V: Common Law Unfair Business Practices, and **GRANTED in part** as to all other proposed amendments;

**IT IS FURTHER ORDERED** that Plaintiff may file an amended complaint within one week of the date of this filing.

_____
**ROBERT C. BRACK**
**SENIOR U.S. DISTRICT JUDGE**